July 22, 2026

**Supreme Court**

No. 2024-377-Appeal.
(P 21-3157)

Patrick M. Hogan                    :

      v.                         :

Amanda H. Wong.                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Patrick M. Hogan                    :

v.                    :

Amanda H. Wong.                    :

Present: Suttell, C.J., Robinson, Lynch Prata, Long, and Indeglia (ret.), JJ.

# O P I N I O N

**Justice Robinson, for the Court.** The plaintiff, Patrick M. Hogan, appeals from an October 7, 2024 order of the Family Court, affirming a decision of the general magistrate that had awarded certain marital assets to the defendant, Amanda H. Wong, in this divorce action. Before this Court, the plaintiff contends that the Family Court erred (1) in "valuing certain marital assets as of the date of separation rather than the date of divorce;" (2) in "fail[ing] to consider unvested stock options and RSUs[1] as an asset to be divided;" and (3) in "failing to consider the wife's

---

[1] As we further discuss *infra*, a stock option is the right to purchase a specific number of shares of company stock at a pre-set price for a fixed period of time, usually following a pre-determined waiting period called the "vesting period." Taryn Phaneuf, *RSUs Vs. Stock Options: What's the Difference?* (Oct. 27, 2025), https://www.nerdwallet.com/investing/learn/rsus-vs-stock-options.
A restricted stock unit (RSU), by contrast, is an award of shares of company stock that is issued subject to a pre-determined vesting schedule. *Id.*

transfer of over $200,000 from the Brokerage Account to her own Checking Account" when the division of marital assets was occurring.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and after carefully reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the order of the Family Court.

# I

## Facts and Travel

The parties were married on October 18, 2018. On May 23, 2021, the parties separated; and, on July 19, 2021, plaintiff filed a complaint for divorce, citing irreconcilable differences. On July 26, 2021, defendant filed an answer and a counterclaim for divorce. A trial was held before a general magistrate of the Family Court on various dates in February and March of 2023 because the parties could not agree on the distribution of the marital assets. The general magistrate heard testimony from both parties and from Jane McAuliffe, a certified divorce financial analyst.[2] Following the trial, the general magistrate issued a written decision that,

---

[2]    Ms. McAuliffe testified that, as a certified divorce financial analyst, she "help[s] folks navigate the financial complexities of their finances and marital estate and separate the estate in the context of divorce."

*inter alia*, (1) awarded to defendant the entirety of her Fidelity checking account; (2) divided the "remaining vested stock options and remaining vested RSUs" in defendant's Fidelity brokerage account "that vested as of May 31, 2021 and that were not otherwise sold in June 2021;"[3] and (3) awarded to defendant certain stock options and RSUs that were unvested as of May 31, 2021.

We summarize below the salient aspects of the testimony of the several witnesses at the trial that we deem relevant to the issues before us on appeal.

**A**

**The Testimony of Patrick Hogan**

Patrick Hogan was the first witness to testify. He stated that he was thirty-eight years old and that he works at ENE Systems as a project manager and earns approximately $145,000 annually. It was Mr. Hogan's testimony that irreconcilable differences between Ms. Wong and him had led to the breakdown of their marriage.

Mr. Hogan testified that during his marriage to Ms. Wong he made most of the financial decisions. He stated: "I basically had full access to both of our accounts and traded, sold options for basically the entirety of []our relationship for ten years." Mr. Hogan recalled that Ms. Wong started her job at Moderna, Inc. "right around the

---

[3]     Ms. Wong was awarded 60 percent of said stock options and vested RSUs, while Mr. Hogan was awarded 40 percent of those assets. *See* Part I.D., *infra*.

time [they] got married." It was Mr. Hogan's testimony that he encouraged Ms. Wong to leave her previous position at a company known as Biogen and to accept the job offer from Moderna. Mr. Hogan stated:

> "It was very intentional for her to get that job. We discussed the technology. I told her the technology at Moderna was fascinating and that I would take the job.
>
> "I helped her through all her employer stock purchase paperwork. I helped her set up all her options in restricted stocks and basically made all transactions in her account prior to separation."

Mr. Hogan testified that he assisted Ms. Wong in selling her stock options at various times. He stated that, while he was usually involved in financial decisions during the marriage, he was not involved in a particular stock transaction in June of 2021 concerning Ms. Wong's Fidelity brokerage account.

On cross-examination, Mr. Hogan admitted that he had had several girlfriends during the time since he and his wife separated. He acknowledged that he and Ms. Wong separated on May 23, 2021. Mr. Hogan stated that he was aware of Ms. Wong's stock options and restricted stock units. He also indicated that he was aware that she would no longer be eligible to receive those unvested stocks if she did not continue her employment at Moderna. It was Mr. Hogan's further testimony on cross-examination that, throughout the course of the marriage, he prepared the couple's joint tax returns. He further stated, however, that they had filed separate tax returns for the tax year 2021. Mr. Hogan admitted that he had asked Ms. Wong

to sell certain Moderna stock in June of 2021 because they "had originally discussed a settlement and just avoiding going to court altogether * * *." It was further Mr. Hogan's testimony that, in June of 2021, he had "walked her through" how to sell that stock during a FaceTime conversation.

**B**

**The Testimony of Jane McAuliffe**

The plaintiff next called Jane McAuliffe, a certified divorce financial analyst, to testify as an expert witness on the issue of Ms. Wong's employment compensation package. Ms. McAuliffe testified that she had reviewed Ms. Wong's stock option incentive plan from Moderna in addition to "a number of Fidelity Investment statements * * * going back to 2018, but most importantly, over the last two or so years." Ms. McAuliffe stated that, in her opinion, the stock option incentive plan "does not directly address whether the division of or transferability of the nonqualified stock option or restricted stock units specifically covers just vested RSUs and nonqualified stock options or the unvested as well."

Ms. McAuliffe further testified as follows:

> "The options are there as a form of incentive for employees to stay with the company for a long period of time. They're also referred to as golden handcuffs. They keep an employee tied to the company for a while and incentivize them to stay so they have the option to realize the worth of these options over time * * *."

Ms. McAuliffe stated that restricted stock units (RSUs) are different from stock options because, as the RSUs vest, "the shares are actually gifted to the employee * * *." She further stated that RSUs are "valued as of [the] date of vesting." Ms. McAuliffe explained that, while stock options are taxed when they are exercised, RSUs are taxed upon vesting.

On cross-examination, Ms. McAuliffe acknowledged that Ms. Wong's stock option incentive plan "seems to state" that the stock options could be divided by a Qualified Domestic Relations Order (QDRO). She further stated: "[W]ith the unvested shares or options, I don't know what happens with those because they're not actually realized yet."

## C

### The Testimony of Amanda Wong

Amanda Wong was called to testify in plaintiff's case-in-chief. She agreed that all the RSUs and stock options that she has received from Moderna have been deposited into a specific Fidelity brokerage account that she identified by account number.[4] She stated that she also has a Fidelity checking account that she uses to pay her bills, rent, and other expenses. It was also her testimony that she has, in the

---

[4] Out of respect for the financial privacy of the parties, we see no reason to include in this opinion the account numbers of the pertinent Fidelity brokerage and checking accounts, although those numbers were testified to in the Family Court. It is undisputed that only one particular brokerage account and one particular checking account are at issue in this case.

past, transferred money from her Fidelity brokerage account to her Fidelity checking account. When asked how many times per year she conducts such a transfer, Ms. Wong stated: "[T]his past year I haven't done it, but the year before this past year, for tax reasons I had to move money from the brokerage to the checking so that I could pay for the taxes that I owed."

It was Ms. Wong's testimony that she and her husband separated on May 23, 2021. When asked whether she had on June 22, 2021 sold certain Moderna common stock, she answered: "Yes. This is the stock that my husband strongly urged me to sell." Ms. Wong acknowledged that, in 2021, the total amount of transfers from her brokerage account to her checking account was $85,841.32. She further acknowledged that, in 2022, the sum of transfers of the same nature was $192,311.20. Following plaintiff's examination of Ms. Wong, plaintiff rested.

Ms. Wong was the only witness to testify in defendant's case-in-chief. It was her testimony that irreconcilable differences existed between herself and her husband, which led to the irremediable breakdown of their marriage. Ms. Wong stated:

> "My husband is very controlling. He self describes himself as ruthless, and he was very cold and condescending during our marriage. He would put me down about my body and my weight. He'd criticize what I ate; pressure me to work out. He would put me down about my intelligence. * * * He would also make me feel real nervous. He would get angry and have a temper, and I always felt like I was walking on eggshells around him.

"* * *

"I would try to talk with him, start conversation, but he would tell me he didn't like small talk and that I should talk to him when I have something more interesting to say, and it was really just like talking to a wall and not getting anything back.

"I think the worst of it was the hateful things he said about my culture. During the rise in antiAsian hate crimes, when we would talk about the news, he seemed really unbothered by it. He would just say people get murdered every day and kind of dismiss it.

"He also would use the racial slur for Chinese people, and he would use the term 'China flu.' When I told him that these offended me, he would tell me not to be so sensitive. * * *

"He would mock and mimic an Asian person with an accent speaking English. The majority of my family has an accent. And when I told him that this was hurtful, he would say no, it's not. He would often imply that my successes were due to the fact that I got special treatment for being Asian. * * *

"I've always wanted to be a mother. And if we had a child, the child would be 50 percent Chinese. I couldn't imagine having a child with somebody that felt that way and thinking about what he would teach the child or instill in the child. And I just -- I didn't want to be in a marriage like that, and I didn't want to start a family like that."

It was further Ms. Wong's testimony that, in her opinion, there was no possibility of a reconciliation.

Ms. Wong testified that, with respect to her above-referenced Fidelity brokerage account, the premarital value of that account was $215,903.78. She

- 8 -

further testified that, during the marriage, her Fidelity brokerage account had appreciated by an amount of $271,376. With respect to her Fidelity checking account, Ms. Wong stated that the premarital value of that account was $10,900.95 and that the then-current value (as of February 16, 2023) was $32,511.80. She stated that, in May of 2021, the balance of her Fidelity checking account was $14,145.79. It was Ms. Wong's testimony that her husband had not contributed anything to her Fidelity checking account since the date of their separation in May of 2021.

Ms. Wong next testified relative to the stock options and RSUs that she had acquired during the marriage as a benefit of her employment at Moderna. Ms. Wong further testified that the stock options and RSUs that had vested since the date of their separation had vested as a continued benefit of her employment, through no effort of her husband. Ms. Wong also testified that she believed that the stock options and RSUs could be divided by a QDRO.

Ms. Wong testified that she had been employed at Moderna since November of 2018 as a quality assurance manager and that her annual base pay is approximately $130,000. She further stated that she had filed tax returns separately for tax year 2021. Ms. Wong explained that she "owed money" on her taxes that year because "[t]here was a large amount of stocks that [her] husband strongly suggested that [she] sell." She testified that she had used some of the proceeds from the sale of the stock to pay her taxes. Ms. Wong stated that Mr. Hogan knew that she was going to sell

that stock because they "were on FaceTime" at the time of the sale. Ms. Wong further stated: "He had me flip the camera around so he could see my screen, and then he walked me through all the clicks and types and everything." It was Ms. Wong's testimony that her husband had proposed an out-of-court divorce settlement using those sale proceeds. Following Ms. Wong's testimony, the defense rested.

**D**

**The Decision of the General Magistrate**

After Ms. Wong's testimony had concluded, Mr. Hogan testified briefly in rebuttal. The trial then adjourned, and the parties thereafter submitted post-trial memoranda.

On October 19, 2023, the general magistrate issued a sixty-nine-page written decision. In that decision, the general magistrate first summarized the testimony of the several witnesses and then reviewed the applicable legal standards relative to the equitable distribution of property in a divorce case. He then determined that certain assets were non-marital and, therefore, were not subject to division.

The general magistrate next applied the statutory factors set forth in G.L. 1956 § 15-5-16.1. He first noted that "this was a very short marriage." He also stated:

> "Both Husband and Wife are young and in good health.
> They are both educated and have employable skills. Both
> Husband and Wife have good jobs, and they have the

ability to acquire further assets and wealth in the future independent of the other."

In addressing Ms. Wong's statements about marital fault, he found Ms. Wong's testimony in that regard to be credible, and he concluded: "Husband is solely at fault for the breakdown of the marriage." The general magistrate determined that Ms. Wong's testimony was "candid, unexaggerated, and credible," while he found that "Husband was not forthright in his testimony and * * * was coy and told half-truths." The general magistrate specifically stated:

> "On direct examination, Husband denied having knowledge Wife sold Moderna stock in June 2021. It is abundantly clear, however, that Wife sold the stock at Husband's urging when the parties were engaged in an out of court attempt to settle the divorce. Husband walked Wife through the process during a [FaceTime] call. Because attempts to settle the case failed, Husband then refused to file joint tax returns leaving Wife to shoulder the tax burden of the transaction."

Accordingly, the general magistrate ruled that "there should not be an equal division of [marital] assets." The general magistrate then proceeded to consider each marital asset separately. However, we need discuss only the division of the particular assets that are relevant to the instant appeal.

Specifically, the general magistrate awarded to Ms. Wong the entirety of her Fidelity checking account. With respect to Ms. Wong's Fidelity brokerage account, the general magistrate ruled as follows:

> "Wife is awarded sixty (60%) percent and Husband is awarded forty (40%) percent of the remaining vested stock options and remaining vested RSUs in [the] account * * * that vested as of May 31, 2021 and that were not otherwise sold in June 2021.
>
> "Husband's award of stocks shall be divided by a Qualified Domestic Relations Order, the cost of which shall be divided equally by the parties.
>
> "Stock shall be divided as a percentage of the existing number of remaining stocks vested as of May 31, 2021 in each stock grant and not as a percentage of value."

With respect to the May 31, 2021 date of the valuation of the assets at issue, the general magistrate noted that "[s]tock values have fluctuated since May 31, 2021 * * *."

Further, with respect to the remainder of assets contained in Ms. Wong's Fidelity brokerage account, the general magistrate ruled:

> "Wife is awarded 100% of all other holdings in her Fidelity brokerage account to include all stock options, grants and RSUs vesting after May 31, 2021."

The general magistrate further stated:

> "Wife's stock grants were a benefit of her employment. Husband did not contribute financially to the acquisition of these assets. * * *
>
> "The [c]ourt is persuaded that in light of the very short duration of this marriage, Wife's stock grants should be viewed as an integral part of her compensation package with Moderna. The vesting of stocks has occurred and will occur based on Wife's continued and future efforts and employment with Moderna after the parties separated. As

- 12 -

Wife's stock portfolio vests, the vesting stock should be treated as additional earned compensation to Wife and should be treated in the same way [as] raises and bonuses. In similar fashion, Husband has and will benefit solely from raises and/or bonuses available through his employment. Moreover, the value in the marital domicile has also likely increased since the last appraisal and Husband will have the benefit of that increased value.

"Ms. McAuliffe referred to Wife's stock grants as 'golden handcuffs'. The [c]ourt finds it would not be equitable to have the stock grants manifest as 'golden handcuffs' to a five (5) year marriage that includes a separation period over the last two plus years. * * * Husband has clearly moved on with no strings attached. The [c]ourt is convinced Wife should be afforded the same consideration with respect to her unvested stock holdings after May 31, 2021 in light of all statutory factors."

**E**

**The Subsequent Travel of the Case**

On January 10, 2024, a decision pending entry of final judgment consistent with the above-referenced October 19, 2023 decision of the general magistrate was entered. On January 23, 2024, plaintiff filed an appeal of the decision pending entry of final judgment; that appeal was lodged with the Chief Judge of the Family Court pursuant to Rule 73 of the Family Court Rules of Domestic Relations Procedure, and it was then assigned to a justice of the Family Court. On September 11, 2024, a hearing was held before a justice of the Family Court, at the conclusion of which the hearing justice denied plaintiff's appeal and affirmed the decision of the general

- 13 -

magistrate. On October 7, 2024, an order reflecting the hearing justice's ruling was entered, and on October 9, 2024, plaintiff filed a notice of appeal to this Court.

## II

## Issues on Appeal

Before this Court, plaintiff contends that the Family Court erred (1) in "valuing certain marital assets as of the date of separation rather than the date of divorce;" and (2) in "fail[ing] to consider unvested stock options and RSUs as an asset to be divided."[5]

## III

## Standard of Review

It is a fundamental principle that "[w]hen hearing an appeal from the Family Court, we have said that it is not our function to arrive at de novo findings and conclusions of fact based on the evidence presented at trial." *Schwab v. Schwab*, 944 A.2d 156, 158 (R.I. 2008) (internal quotation marks omitted); *see also Curry v. Curry*, 987 A.2d 233, 237 (R.I. 2010). We have repeatedly stated that we "will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless

---

[5] The plaintiff further contends that the Family Court erred in "failing to consider the wife's transfer of over $200,000 from the Brokerage Account to her own Checking Account" when the division of marital assets was occurring. It is clear from the record that plaintiff did not raise this argument in the proceedings below. Accordingly, "[p]ursuant to our well established raise-or-waive rule, issues that are raised for the first time on appeal will not be reviewed by this Court." *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1280 (R.I. 2007).

- 14 -

he or she has misconceived the relevant evidence or was otherwise clearly wrong." *Cronan v. Cronan*, 307 A.3d 183, 194 (R.I. 2024) (quoting *Sullivan v. Sullivan*, 249 A.3d 637, 641 (R.I. 2021)). "Accordingly, when the parties contest the equitable distribution of marital assets, this Court will not disturb the trial justice's findings where he or she has scrupulously considered all of the elements set forth in G.L. 1956 § 15-5-16.1." *Curry*, 987 A.2d at 238 (brackets, deletion, and internal quotation marks omitted).

## IV

## Analysis

It will be recalled that Mr. Hogan contends that the Family Court "committed legal error" by "award[ing] Ms. Wong [sixty] percent and Mr. Hogan [forty] percent of the vested stock options and vested RSUs as of May 31, 2021 * * *." (Internal quotation marks omitted.) In Mr. Hogan's view, "[t]he use of the [p]arties' separation date to cut off the division of a [marital] asset (the Brokerage Account) is contrary to established precedent that marital assets are valued at divorce, not separation." For her part, Ms. Wong contends that the general magistrate "correctly determined that the record reflected compelling circumstances to value the assets as of the date of separation, when Mr. Hogan decided he was free to live his life as an unmarried man." We agree with Ms. Wong's contention in this regard.

It is true that "[t]his Court has held that marital assets should be valued as of the date of trial unless there are compelling circumstances warranting a deviation." *Curry*, 987 A.2d at 246 (internal quotation marks omitted).  Based on the record before us, we are satisfied in this case that there was more than sufficient evidence of compelling circumstances that warranted a valuation of those assets as of the date of the parties' separation and not as of the date of trial, some two years later. *See id.*

In his decision, the general magistrate thoroughly reviewed the testimony of the witnesses at trial.  He specifically found that Mr. Hogan was "solely at fault for the breakdown of the marriage."  He also concluded that Ms. Wong's testimony was "candid, unexaggerated, and credible."  In stark contrast, he found that Mr. Hogan "was not forthright in his testimony and * * * was coy and told half-truths."  Among the factors which the general magistrate took into account were: the short duration of the marriage; the fact that the stock options and RSUs were an "integral part" of Ms. Wong's compensation at Moderna; and the fact that Mr. Hogan had "clearly moved on with no strings attached" after the parties' separation in May of 2021.  For these reasons, the general magistrate found it equitable to divide the stocks and RSUs contained in Ms. Wong's Fidelity brokerage account as was reflected in that account on the date of the separation, May 31, 2021.[6]

_____

[6]    It will be recalled that, by contrast, the equity of the marital domicile was valued as of the date of the trial; in our judgment, the general magistrate did not err in so doing.

- 16 -

It is clear to us that the circumstances present in the instant case were sufficiently compelling to allow the general magistrate to value the assets at issue as of the date of the parties' separation. *See Curry*, 987 A.2d at 246.  The general magistrate made specific findings in his decision that assigned fault to Mr. Hogan for the breakdown of the marriage and further made a finding that "[i]n consideration of the statutory factors[7] there should not be an equal division of [marital] assets."

---

[7]    The "statutory factors" referred to by the general magistrate are set forth in G.L. 1956 § 15-5-16.1(a).  That statute requires the trial justice to consider the following factors:

"(1) The length of the marriage;
"(2) The conduct of the parties during the marriage;
"(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
"(4) The contribution and services of either party as a homemaker;
"(5) The health and age of the parties;
"(6) The amount and sources of income of each of the parties;
"(7) The occupation and employability of each of the parties;
"(8) The opportunity of each party for future acquisition of capital assets and income;
"(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
"(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;

*See Saback v. Saback*, 593 A.2d 459, 461 n.1 (R.I. 1991). Accordingly, we see no reason to second-guess the general magistrate's findings in this regard.

Mr. Hogan also contends that "[t]he Family Court failed to consider unvested stock options and RSUs as an asset to be divided." In his view, "[t]he failure to divide this category of marital assets, apparently because they vest in the future, is incorrect as a matter of law." For her part, Ms. Wong contends that the general magistrate "was well within his discretion to assign Ms. Wong's unvested, and not yet realized employment compensation, to Ms. Wong as of the date of separation * * *."

This Court has repeatedly stated that "the equitable distribution of property is a three-step process." *Koutroumanos v. Tzeremes*, 865 A.2d 1091, 1096 (R.I. 2005). In accordance with that process, "[t]he trial justice first must determine which assets are marital property, then must consider the factors set forth in § 15-5-16.1(a), and finally, he or she must distribute the property." *Id.* In conducting a review pursuant to § 15-5-16.1(a), "a judicial officer need not explicitly list his or her findings on each factor so long as this Court can determine that the judicial officer considered all the necessary facts and statutory factors." *Cronan*, 307 A.3d at 198 (brackets and

> "(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
> "(12) Any factor which the court shall expressly find to be just and proper."

- 18 -

internal quotation marks omitted).  This Court has further stated that "[s]uch determination of the parties' marital property and its equitable distribution is within the sound discretion of the trial court." *Curry*, 987 A.2d at 238 (internal quotation marks omitted).  We have also stated that "the distribution of the marital assets 'need not be equal in order to be equitable.'" *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1282 (R.I. 2007) (quoting *Koutroumanos*, 865 A.2d at 1098).

In the instant case, we are satisfied that the general magistrate acted within his discretion when he assigned to Ms. Wong the unvested portion of stock options and RSUs as of May 31, 2021.  With respect to those assets, the general magistrate noted several factors that he considered to be persuasive, including: the "very short duration" of the marriage and the fact that Mr. Hogan "was solely responsible for this marriage failing."  Additionally, he emphasized that the stock grants were a benefit of Ms. Wong's employment.  He also took into account the fact that both Mr. Hogan and Ms. Wong "are young, in good health, educated and have good jobs," and he further noted that Mr. Hogan "has clearly moved on with no strings attached."

In view of the circumstances described above, it is our view that the general magistrate did not abuse his discretion in dealing as he did with the unvested portion of Ms. Wong's stock options and RSUs.  That distribution was predicated upon his findings of fact, and our own review of the record has convinced us that those findings of fact were well supported. *See Sullivan*, 249 A.3d at 641.

For these reasons, we perceive no abuse of discretion on the part of the general magistrate, and we uphold his division of the marital assets.

**V**

**Conclusion**

For the reasons set forth in this opinion, we affirm the order of the Family Court. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Patrick M. Hogan v. Amanda H. Wong. |
| **Case Number** | No. 2024-377-Appeal.<br>(P 21-3157) |
| **Date Opinion Filed** | July 22, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, Long, and Indeglia (ret.), JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Richard A. Merola |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Derek M. Gillis, Esq. |
| | For Defendant:<br><br>Gregory S. Inman, Esq. |